STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

SCOTT D. JOINER (CABN 223313)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Scott.Joiner@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>ALAN VARELA,<br><br>    Defendant. | NO. CR 21-00192 WHO<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

1

## TABLE OF CONTENTS

2   INTRODUCTION ........................................................................................................1

3   RELEVANT FACTS ..................................................................................................1

4   I.      OFFENSE CONDUCT .....................................................................................1

5           A.      The Scheme...........................................................................................1

6           B.      The Asphalt Plant..................................................................................2

7           C.      The Conspirators Funnel One Hundred Thousand Dollars to Nuru ....................................2

8           D.      The Conspirators Lavish Nuru with Twenty Thousand Dollars in High-End

9                   Dinners ................................................................................................3

            E.      Varela Finances and Delivers Nuru's $40,000 Tractor .......................3
10
    II.     VARELA'S BACKGROUND .........................................................................8
11
    SENTENCING ANALYSIS .........................................................................................8
12
    I.      GUIDELINES CALCULATION ....................................................................8
13
    II.     SENTENCING RECOMMENDATION .........................................................9
14
            A.      Legal Standard .....................................................................................9
15
            B.      Sentencing the Defendant to 30 Months' Imprisonment Would Vindicate the
16                  Interests Set Forth in 18 U.S.C. § 3553(a) .......................................10

17                  1.      Varela's Offense Violates the Public Trust and Threatens the Rule of

18                          Law .........................................................................................10

19                  2.      Varela is Not Entitled to a Reduced Sentence for his Attorney's

                            Attempted Cooperation...........................................................11
20
                    3.      Bribery of a Powerful Public Official Like Nuru Warrants Increased
21
                            Punishment...............................................................................12
22
                    4.      Varela Deserves a Downward Variance for his Pre-Indictment Plea...................13
23
            C.      Varela's Offense Warrants a Significant Fine .....................................13
24
    CONCLUSION...........................................................................................................13

25

26

27

28

## INTRODUCTION

Alan Varela was an American success story.  Hailed in the media as epitomizing the American Dream, he expanded his engineering and construction businesses, owned multiple luxury homes and vehicles, and acquired significant wealth.  In truth and in fact, Alan Varela is a fraud.  For years Varela conspired to deprive the public of the honest services of one of the most powerful public officials in San Francisco using bribes and kickbacks – all to enrich himself, his business partners, and the corrupt public official they had in their pocket.  The government respectfully submits that Alan Varela's criminal conduct warrants a substantial custodial sentence of 30 months in prison, three years of supervised release, and a criminal fine of $250,000.

## RELEVANT FACTS

### I.    OFFENSE CONDUCT

#### A.    The Scheme

From 2013 through January 2020, Varela agreed with Mohammed Nuru, Balmore Hernandez, William Gilmartin III, and others, to defraud the public of Nuru's honest services. The facts of Varela's crime are detailed in the sworn affidavit supporting the Criminal Complaint (ECF No. 1), Paragraph 2 of his Plea Agreement (ECF No. 37), and Paragraphs 7 through 29 of the Revised Presentence Investigation Report (ECF No. 47) ("PSR").

Varela and Gilmartin are business partners in a number of ventures, including ProVen Management ("ProVen"), a Bay Area civil engineering and construction firm that specializes in large-scale infrastructure projects.  Crim. Compl., ECF No. 1 at ¶ 18.  Varela founded ProVen in 1991 and served as ProVen's President while Gilmartin served as Vice President.  *Id.*  Balmore Hernandez was the CEO and Vice President of AzulWorks, Inc. (AzulWorks).  *Id.* ¶ 19.  Prior to forming AzulWorks, Hernandez was a longtime employee of San Francisco Public Works.  *Id.*

Nuru was the director of San Francisco Public Works, also known as the Department of Public Works ("DPW") for the City and County of San Francisco ("the City").  Plea Agmt., ECF No. 37 at ¶ 2.b.  As Director of DPW, Nuru had great influence over City business and policy, including public contracts, permits, and construction projects in the City.  *Id.*  His power and influence extended not only to contracts and permits within the purview of DPW, but also numerous City departments, as well as the

private companies and individuals that required approvals and contracts from DPW and other City agencies in the ordinary course of their business. *Id.*

As Varela admitted in his plea, "I agreed to pay bribes and kickbacks to NURU, who was then a public official with the City and County of San Francisco, in exchange for NURU's official acts and the official influence he wielded. I did so knowingly... The purpose of the conspiracy was to protect and preserve NURU's power and influence as a public official, and to use his power and influence to enrich ourselves and ensure the success of our business ventures." Plea Agreement, ECF No. 37 at ¶ 2.a.

**B.    The Asphalt Plant**

Varela's conspiracy manifested itself in various activities, but as he admitted in his plea, "all of the actions… were intended to enrich myself, Gilmartin, Hernandez and Nuru through the exercise of Nuru's power and influence and official actions in exchange for items of value." *Id.* at ¶ 2.d. As part of the scheme, Varela and his co-conspirators provided free meals and entertainment for Nuru at various restaurants, cash, equipment for Nuru's ranch, and promised Nuru a portion of the proceeds that they expected to earn from City contracts or subcontracts awarded to them as a result of Nuru's official acts or influence. *Id.* ¶ 2.e. For his part, and as described in more detail below, Varela travelled to South America with Nuru and personally arranged the financing and delivery to Nuru of a tractor worth tens of thousands of dollars.

Varela and his co-conspirators focused in large part on winning a supply contract with DPW and a related lease with the Port of San Francisco (the "Port") to operate an asphalt recycling plant and concrete plant on Port land. *Id.* ¶ 2.f. In exchange for cash and other items of value, as well as a potential share of the future profits, Nuru agreed to use his official position in an effort to have their proposal selected as the most qualified bidder. *Id.*

**C.    The Conspirators Funnel One Hundred Thousand Dollars to Nuru**

The bid Varela's group submitted ultimately consisted of a proposed joint venture between COMPANY 1, COMPANY 2, and COMPANY 3. *Id.* ¶ 2.g. COMPANY 2 told Varela and Gilmartin that it was interested in the joint venture primarily because of the opportunity it provided to work closely with COMPANY 4, which was responsible for a much larger project commissioned by the City. *Id.* To induce COMPANY 2 to participate in the joint venture, Gilmartin asked Nuru to encourage COMPANY

4 to award a contract relating to the larger project to COMPANY 2. *Id.* COMPANY 4 later awarded a contract to COMPANY 2. *Id.* To compensate Nuru for his actions, Gilmartin asked COMPANY 2 to award a subcontract to Hernandez to generate proceeds that could be used to pay Nuru. *Id.* COMPANY 2 thereafter awarded the subcontract to Hernandez, the proceeds of which Hernandez used to benefit Nuru. *Id.* The value of the subcontract was approximately $100,000. *Id.*

### D. The Conspirators Lavish Nuru with Twenty Thousand Dollars in High-End Dinners

Prior to that, beginning at the end of 2013, Varela and Gilmartin had used Hernandez to obtain confidential information about the asphalt recycling plant project from Nuru. *Id.* ¶ 2.h. Hernandez received draft versions of the City's Request for Proposals (RFP) and other inside information about DPW and Port plans for the project from Nuru (who would email the materials from his work email to his personal account and then to Hernandez). *Id.* Hernandez would then share the materials with Gilmartin and Varela. *Id.* Varela, the President of ProVen, was copied on some but not all of the early communications. PSR ¶ 15. But as Varela stated in his plea agreement: "This allowed us to privately provide input on the draft through Nuru so that we would be better positioned to have our proposal selected as the winning bid after the RFP was released to the public." *Id.* Gilmartin, the Vice President of ProVen, would meet regularly with Hernandez and Nuru to discuss their plans, almost always over dinner at Restaurant 1 in San Mateo, CA. *Id.* Gilmartin paid for dinner at these meetings using his ProVen company credit card, ultimately spending more than $20,000 on the meals. *Id.* ¶ 2.j.; Crim. Compl., ECF No. 1 at ¶ 21.

The RFP drafting process continued for some time, as did expensive dinner meetings and the flow of inside information about the project from Nuru. Plea Agreement, ECF No. 37 at ¶2.i. Varela's joint venture was selected as the most-qualified bidder in September 2015, but negotiations with DPW and the Port about the final lease and supply agreement for the asphalt plant stretched on for years. *Id.* In fact, the co-conspirators were still attempting to finalize agreements with the City when Nuru was arrested on federal charges in January 2020. *Id.*

### E. Varela Finances and Delivers Nuru's $40,000 Tractor

In addition to the asphalt plant, the co-conspirators also discussed with Nuru other ways in which he could use his official position to benefit their business ventures. *Id.*¶ 2.k. During these discussions

1  (about the asphalt plant and other matters), Nuru would request additional items of value that he wanted

2  in exchange for his ongoing assistance. *Id.* One such item was a high-end tractor for his ranch, which

3  Varela took the lead on financing and delivering in late 2018 and early 2019. PSR ¶ 13. The tractor and

4  attachments cost approximately $40,000.00 and were financed in such as a way as to make it appear like

5  it was part of Varela's normal business operations rather than as a bribe to Nuru. PSR ¶¶ 7, 13; Crim.

6  Compl., ECF No. 1 at ¶ 112.[1]

7      In the fall of 2018, just before Varela arranged the purchase of the tractor, he traveled to South

8  America with Nuru and well-known permit expediter, Walter Wong. Crim. Compl., ECF No. 1 at ¶¶

9  110-111. Wong has pleaded guilty to conspiring to bribe Nuru in a related case (CR 20-00257 WHO)

10  and is cooperating with the government's investigation. *Id.* ¶ 110. Varela's communications with Wong

11  in September 2018 show that Varela was concerned about being seen in public with Nuru because of

12  their corrupt dealings. *Id.* ¶ 111. On September 18, 2018, Varela and Wong emailed about arranging a

13  dinner meeting with Nuru. According to an email to Varela from Wong, Nuru had suggested Restaurant

14  1 (where he had repeatedly been wined and dined with Gilmartin and Hernandez). *Id.* Wong wanted to

15  know if Varela had any other suggestions. Varela responded: "Hi Walter, [Restaurant 1] in San Mateo

16  might be better considering that this way we will not be meeting with Mohammed in SF." *Id.*

17      A few months after the South America trip, Varela lined up the purchase and financing of a John

18  Deere tractor and arranged to deliver the tractor and attachments to Nuru at his ranch on February 18,

19  2019. Crim. Compl., ECF No. 1 at ¶ 112. The plans to deliver the tractor, however, had been in process

20  for much longer. For example, on May 9, 2018, Hernandez texted Gilmartin: "Our friend is reminding

21  me of the piece of equipment that was promised Can you check." *Id.* ¶ 115. Gilmartin replied "I

22  thought you were going to send a model number i will take care of it." *Id.* On July 9, 2018, Hernandez

23  again texted Gilmartin:

24      HERNANDEZ:      Dinner on Wednesday or Thursday

25                      He is also asking about the equipment

26      GILMARTIN:      Either day

27

28  _____
   [1] For guidelines calculations, the parties have stipulated that the value to Nuru for the use of the
   tractor was approximately $20,000.00. PSR ¶¶ 8, 28.

| | |
|---|---|
| HERNANDEZ: | You pick a day and let's meet |
| GILMARTIN: | Ok |
| | Wednesday |
| HERNANDEZ: | Ok good |
| | Same place at 7:30 |

*Id.* ¶ 116.

By November 2018, Varela was emailing with a sales representative about purchasing the tractor for Nuru.  *Id.* ¶ 117.  On November 15, 2018, Varela identified the tractor model and attachments he wanted to purchase and emailed the sales representative the following day that it would need to be delivered to "Colusa," but he still needed to get the exact address.[2]  *Id.*  Employees at the company who sold the tractor to Varela recall he was in a rush to get it delivered.  *Id.*

Business and email records show the invoice for the tractor was dated December 5, 2018, and a version signed by Varela was emailed back to the sales representative on December 13, 2018.  *Id.* ¶ 118. Business records also show Varela executed documents supporting the loan to purchase the tractor on or about December 31, 2018, and January 9, 2019.  *Id.* ¶ 119.  The tractor was not delivered to Nuru, however, until February 2019.  *Id.*

On January 18, 2019, Hernandez texted Varela the address for Nuru's ranch and asked Varela in Spanish if they could talk.  *Id.* ¶ 120.  On February 6, 2019, Hernandez also texted Gilmartin about dinner at the "same place" and asked, "Anything on the tractor?"  *Id.* ¶ 121.  Gilmartin responded "Ready for delivery."  *Id.*

The following day, on February 7, 2019, Nuru called Hernandez. Hernandez told Nuru that he "spoke with Alan [Varela] and the John Deere is ready. You need to give me two days, available days, on weekdays in the next two weeks, he uh, John Deere have to deliver and teach you how to operate it, so you need to give me two days and they'll pick one of those days to make it work for you." *Id.* ¶ 122

On February 11, 2019, Nuru and Hernandez had the following text message exchange about

---

[2] Nuru's ranch is located in Stonyford in Colusa County, California.  *Id.*  ¶ 20.  The same email communications described above show Varela was purchasing a slightly cheaper model of the same tractor at the same time and having it delivered to his personal residence in Napa. *Id.* ¶ 117.

arranging dinner with Gilmartin and coordinating the tractor delivery:

| | | |
|---|---|---|
| HERNANDEZ: | Bill [Gilmartin] cannot change his appointment on Wednesday as | |
| | he has a client flying in for Europe | |
| | Either tomorrow or next week | |
| | Please let me know | |
| NURU: | Next week is better if tomorrow doesn't work. | |
| | Can't do Tuesday, next week is better | |
| | Next Wednesday, February 20th is good | |
| HERNANDEZ: | Ok let me check | |
| NURU: | Will bet [sic] ranch 18 & 19 | |
| HERNANDEZ: | Ok | |
| | You can coordinate directly with Alan [Varela] if you wish | |
| NURU: | Best you handle this unless you advise otherwise. | |
| HERNANDEZ: | Ok I will | |
| | Confirmed dinner for next Wednesday | |

*Id.* ¶ 123.

Following this last text, Nuru called Hernandez. *Id.* ¶ 124. Hernandez confirmed the arrangements described above. *Id.* Nuru would be at his vacation home on the following Tuesday and Wednesday so he could receive delivery of the John Deere tractor. *Id.* During the exchange, Nuru also said he thought it was better if Hernandez dealt directly with Varela and Gilmartin rather than Nuru. *Id.* ¶ 124. On February 13, 2019, Nuru and Hernandez spoke by phone about the delivery of the tractor at noon on February 18, 2019. *Id.* ¶ 125. Hernandez made clear to Nuru that they were using someone else's name for the delivery:

| | |
|---|---|
| HERNANDEZ: | The the equipment is scheduled for the 18th at noontime, ok, at 12 |
| NURU: | oh 12 |
| HERNANDEZ: | They're gonna ask for Sandra, we give a Sandra's name, ok?[3] |
| NURU: | Ok, no problem, no problem |

---

[3] "Sandra" is the first name of Nuru's girlfriend at the time.

| | | |
|---|---|---|
| HERNANDEZ: | Ok, if anything changes, let me know, ok? | |
| NURU | Ok ok, that's good, that's good, I'll be up there, so I'll be there for sure, yeah | |

*Id.* ¶ 125.

The following day, on February 14, 2019, Hernandez texted Varela "Gracias." *Id.* ¶ 126. On February 18, 2019, Nuru texted Hernandez a photo of the John Deere tractor being unloaded from a truck and wrote "Works begins at the ranch." *Id.* ¶ 127. On the same day Nuru also texted Varela "Thank You." *Id.* ¶ 128. He then called Varela to thank him for the tractor:

| | | |
|---|---|---|
| NURU: | Mr. Alan. | |
| VARELA: | Hey how are you? | |
| NURU: | Man did you see that brother? very nice very very nice | |
| VARELA: | Ok good | |
| NURU: | Yeah beautiful machine | |

*Id.* ¶ 128. After discussing the beauty of Nuru's new tractor, Varela said "I am going to make another trip um probably next week to bring the attachments….so I got one more attachment that is a bore attachment, another attachment that is a grading attachment for spreading rock and leveling things, ok, I'm glad they made it over there." *Id.* Nuru responded "Nice, nice. I just finished my training course (laughs)" and Varela replied "Good. That is the only reason I wanted to coordinate. Otherwise, I wouldn't have told them to deliver it, but uh, there are a few things that need to be, go over, and how things connect and that stuff." *Id.* The two then ended their conversation with Varela telling Nuru they would talk again soon:

| | | |
|---|---|---|
| NURU: | Ok nice nice nice Ok ok just wanted to say thank you so much. I'll send you a picture. It's got a a nice house in my ranch where I am going to keep it. I will send you the picture right now. You see it in the garage haha | |
| VARELA: | Awesome that is good. It's got air conditioning right? | |
| NURU: | Oh yeah its beautiful air condition and heater. Oh yeah man its good. Work now. No excuse now but to work. We can work now haha | |
| VARELA: | Good alright Mohammed. Have a great day. Enjoy your day. Glad that | |

1                  thing showed up and uh

2        NURU:        Thank you

3        VARELA:     We will talk shortly

4  *Id.* ¶ 129. Nuru had a similar conversation with Hernandez the following day, on February 19, 2019.

5  The two of them discussed Nuru's new tractor and Hernandez asked if Nuru was happy with it. Nuru

6  responded "Yeah, yeah, very nice. It's a nice tractor. Very nice, you know, it's a modern tractor for

7  sure." *Id.* ¶ 130. The day after that, on February 20, 2019, Nuru met again with Hernandez and

8  Gilmartin for dinner at Restaurant 1 in San Mateo. The bill was $ 716.80. *Id.* ¶¶ 131-132.

## II.    VARELA'S BACKGROUND

10      Alan Varela was born in 1961 in Santiago, Chile. PSR ¶ 52. He enjoyed a childhood free from

11  abuse and neglect. *Id.* ¶ 53. At the age of 22, Mr. Varela earned an academic scholarship and obtained a

12  student visa to enter the United States, where he attended university in Boston, Massachusetts. *Id.* ¶ 54.

13  A year after his arrival in the United States., he began working in the construction field. *Id.* In 1989, he

14  relocated to the San Francisco Bay Area where he founded ProVen Management in 1991. *Id.*; Crim.

15  Compl. ECF No. 1 at ¶ 18. In 2012, Hispanic Executive magazine published a profile on Varela,

16  leading with this assessment of his life and career: "America has been built by immigrants who come to

17  this country on a shoe string, with no more than a dream to make a better life for themselves and their

18  families—Alan Varela is no exception and epitomizes the American success story…. Ambitious, hard-

19  working, and honest, Varela excelled in his chosen career." Jennifer Hogeland, *Coming Full Circle*,

20  HISPANIC EXECUTIVE, (Apr. 1, 2012) https://hispanicexecutive.com/coming-full-circle/ (attached here

21  Exhibit A). As noted in the PSR, Varela owns two homes in "upper class areas of California," including

22  a residence on more than 50 acres in Napa, several luxury vehicles and other significant assets. PSR ¶¶

23  59, 70.

**SENTENCING ANALYSIS**

## I.    GUIDELINES CALCULATION

26      The government concurs with the PSR's Guidelines analysis which results in a total combined

27  offense level of 21, calculated as follows:

28      a.      Base Offense Level, U.S.S.G. § 2C1.1(a)(2):       12

b.   Specific offense characteristics:

    -   High ranking public official, U.S.S.G. § 2C1.1(b)(3)       +4

    -   Value of the payment in excess of $95,000 but less than $150,000    +8

c.   Acceptance of Responsibility:    -3

d.   Adjusted Offense Level:    21

## II.   SENTENCING RECOMMENDATION

### A.   Legal Standard

Under 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary," to achieve the goals of sentencing based on the following factors:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3)   the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

The U.S. Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). While there is no presumption of reasonableness for a Guidelines range sentence, if a district judge "decides that an outside-Guidelines sentence is warranted, [the court] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Carty*, 520 F.3d at 991-992 (citing *Gall v. United States*, 552 U.S. 38, 50, (2007)); *see also United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011) ("district court must start with the recommended Guidelines sentence, adjust upward or downward from that point, and justify the extent of the departure from the Guidelines sentence."). As the Supreme Court recognized in *Gall*, "a major departure should be supported by a more significant justification than a minor one." 552 U.S. at 50. Finally, "[a]s a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing." *United States v.*

*Armstead*, 552 F.3d 769, 777-78 (9th Cir. 2008); *see, e.g.*, *United States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir. 2010).

**B.     Sentencing the Defendant to 30 Months' Imprisonment Would Vindicate the Interests Set Forth in 18 U.S.C. § 3553(a)**

**1.     Varela's Offense Violates the Public Trust and Threatens the Rule of Law**

The seriousness of the present offense warrants a significant custodial sentence. Alan Varela's selfish and greedy acts of public corruption harmed far more than the bidding process for an asphalt plant.  In addition to revealing his true lack of moral character, the bribery he pursued and the casual culture of corruption he facilitated will reverberate in the public's consciousness for years to come. Bribery like Varela's strikes at the very heart of open, democratic governance and undermines the public's faith in our institutions and, ultimately, the rule of law.  Few cases implicate the second sentencing factor above – "the need … to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" – in the way that public corruption offenses do.

As the Supreme Court recognized long ago, bribery is the "perversion or destruction of integrity in the discharge of public duties."  *Nixon v. Shrink Missouri Government*, 120 S. Ct. 897, 923 (J. Thomas, dissent), quoting 3 Oxford English Dictionary 974 (1989).  And as Chief Justice Rehnquist wrote, corruption is nothing less than "the subversion of the political process.  Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns."  *Fed. Election Comm'n v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 497 (1985).

In participating in a long-running scheme to bribe Mohammed Nuru, Alan Varela revealed himself to be an individual who believes the rules should only apply to other people.  Not to him.  In pursuing his own greed, not once did Varela stop Gilmartin from lavishing Nuru with expensive dinners or funneling cash and tens of thousands of dollars to Nuru through a subcontract with Hernandez.  To the contrary, Varela himself stepped in to handle the delivery of Nuru's prized tractor. What is even more galling is the fact that at the time the conspiracy began, Varela had already achieved great success and accumulated significant wealth. He did not commit this crime to feed his family, or out of desperation, or because ProVen needed another public contract.  He did it simply for the chance to line

his pockets from the public coffers – the chance to purchase more houses and more cars. As the facts

above make clear, this conduct was not an aberration.  For Alan Varela, it was business as usual.

**2.**     **Varela is Not Entitled to a Reduced Sentence for his Attorney's Attempted Cooperation**

Varela's counsel argues that his client was prepared to cooperate and should get a lesser sentence

based on counsel's offer of cooperation and his attorney proffer to the government. His argument is

fatally flawed.  If it were to be accepted, any defendant who offered cooperation to the government

could obtain a sentence reduction regardless of whether the proffered cooperation was useful or

substantially assisted the investigation – or, as it seems in this case, regardless of whether the defendant

actually met with government investigators.  The Court should reject Varela's argument accordingly.

The government never met with Varela. Counsel claims he believed that both Gilmartin and

Varela could obtain cooperation plea agreements, despite the fact that Gilmartin was the first defendant

to personally meet with and proffer with the government.  What counsel implicitly acknowledges, but

fails to make clear in his argument, is that the government made no promises about cooperation to any

counsel during attorney proffers.[4]  To the contrary, as is standard practice, the government made clear

that no guarantees could or would be made about cooperation and that any decision regarding

cooperation plea agreements could only be made after vetting the individual defendant's information

during meetings with federal law enforcement.

Gilmartin was the first defendant in this case to meet with investigators and provide information

that the government deemed credible and potentially worthy of a cooperation plea agreement.[5]

Government counsel is ignorant of how the joint defense arrangement between Gilmartin and Varela led

counsel to believe that both defendants would become cooperators, especially considering the fact that

---

[4] Counsel also appears to be operating under the mistaken assumption that his attorney proffers provided significant information from Varela of which the government was previously unaware.  This is incorrect.

[5] The defense argues that "it will be a uniquely unfair result if, at the ultimate conclusion of this case, Mr. Varela receives a longer sentence than Gilmartin."  ECF No. 48 at 21. But at the same time, the defense underscores Gilmartin's superior viability as a cooperator by emphasizing "significant firsthand knowledge" that Gilmartin possesses and Varela lacks. *Id.* at 10.  Gilmartin's sentence has yet to be determined, and is ultimately up to the Court based on a number of factors, but the idea that Varela should get a lesser sentence than Gilmartin based on tardy offers of inferior cooperation makes little sense.

Varela had ample opportunities to cooperate with the government on his own before and after he was charged. Instead, he chose to circle the wagons and his counsel repeatedly argued to the government that Varela had done nothing wrong. While Mr. Varela deserves credit for resolving his case pre-indictment, his attempt to blame the government for his failed cooperation is entitled to zero weight. It would appear that Mr. Varela's true quarrel is with his co-defendant, who beat him to the courthouse, not the government. As government counsel repeatedly and consistently informed counsel for both defendants, it was not in either of their client's best interest to delay resolution of their cases. The appropriate sentence in this case and the seriousness nature of Varela's crime are in no way mitigated by belated efforts to cooperate.

### 3. Bribery of a Powerful Public Official Like Nuru Warrants Increased Punishment

The fact that Varela sought to bribe the Director of DPW further supports the custodial sentence recommended by the government. Mohammed Nuru was one of the highest-ranking public officials in the City of San Francisco. As Varela admitted in his plea agreement, Nuru "had great influence over City business and policy, including public contracts, permits, and construction projects in the City. His power and influence extended not only to contracts and permits within the purview of DPW, but also numerous City departments, as well as the private companies and individuals that required approvals and contracts from DPW and other City agencies in the ordinary course of their business." ECF No. 37 ¶ 2.b. Accordingly, the plea agreement includes a four-point increase in the recommended Guidelines to reflect the fact that the individual Varela bribed was a high-level public official. U.S.S.G. § 2C1.1(b)(3).

The Ninth Circuit and others have upheld this enhancement for all defendants involved in the corruption of a high-level public official, noting that the harm from bribery and corruption of high-level officials is a distinct and additional harm from an individual breach of trust. *United States v. Santos*, 501 Fed. Appx. 630, 634 (9th Cir. 2012) ("the distinct harm at which § 2C1.1(b)(3) is aimed is the corruption of high-level public officials as distinct from an individual official's breach of the public trust."). All of these factors support a significant custodial sentence. Indeed, absent Varela's pre-indictment acceptance of responsibility, his felony offense would warrant far more than the 30-month

1    sentence now being sought by the government. But the government's recommendation is tempered by

2    the recognition that Varela's pre-indictment acceptance of responsibility deserves consideration.

3            **4.      Varela Deserves a Downward Variance for his Pre-Indictment Plea**

4            The government therefore recommends that the Court sentence Varela to 30 months'

5    imprisonment, seven months below the low end of the Guidelines calculation above.  Although Varela

6    should receive no credit for failed cooperation, this variance remains appropriate because of Varela's

7    early decision to plead guilty, waive indictment, and accept responsibility.  Similarly situated

8    defendants, however, who do not promptly accept responsibility, are entitled to no such consideration.

9        **C.      Varela's Offense Warrants a Significant Fine**

10           Finally, as noted in the PSR, Varela has significant assets that support a criminal fine.  Given that

11   Varela's crime appears to have been motivated by casual greed, despite already having accumulated

12   substantial wealth, the government respectfully submits that a substantial fine is particularly appropriate

13   here and would serve as just punishment. In light of the serious nature of the offense and the defendant's

14   callous motivation, the government therefore recommends that the Court impose a fine of $250,000.

15                                    **CONCLUSION**

16           For the foregoing reasons, the government recommends that the Court sentence defendant Varela

17   to 30 months' imprisonment to be followed by three years of supervised release, a $250,000 fine, the

18   expanded search condition agreed upon in the plea agreement, and a $100 special assessment.

19

20   DATED:  September 9, 2021                    Respectfully submitted,

21                                                STEPHANIE M. HINDS
22                                                Acting United States Attorney

23

24                                                _____/s/_____
                                                  SCOTT D. JOINER
25                                                Assistant United States Attorney

26

27

28

# EXHIBIT A

# Coming Full Circle

## Alan Varela on constructing a successful career in the US and expanding to his business, ProVen Management, to his native Chile

by [Jennifer Hogeland](#)    April 1, 2012



"The economy in Chile is fairing better than the US. We felt it would be beneficial to diversify our geographical reach so we are not so dependent on a single market," says Alan Varela, owner of ProVen Management.

America has been built by immigrants who come to this country on a shoe string, with no more than a dream to make a better life for themselves and their families—Alan Varela is no exception and epitomizes the American success story.

Born and raised in Chile, Varela came to the United States in September 1982 armed with a student visa and in pursuit of a business degree. Upon arrival, his application for a work visa was denied leaving him little choice but to tap into his hard-earned and limited savings. In another blow, the Chilean peso had devalued leaving Varela a destitute student. Without a job or savings, Varela spent his time studying and attending university until finally, after working a series of intermittent jobs, he was hired on as truck driver by a Boston construction company.

While continuing his education and moonlighting in construction, Varela quickly worked his way from truck driver to equipment operator to foreman. In 1986, Varela earned degrees in finance and banking from Boston University. However, Varela was surprised to learn that his construction experience was as valuable as his hard-earned education. "As I looked for a job in the financial sector, I realized that the starting salary was one third of what I could earn on the construction site," Varela says. He remained loyal to the construction industry, paid remnant debt from his education, saved for and bought his first house and, before he knew it, 20 years had passed and he found himself still happily entrenched in construction.

Ambitious, hard-working, and honest, Varela excelled in his chosen career progressing from estimator to project

manager to general manager for a family-owned construction company. With a vision for expanding into new markets and developing new strategies for obtaining bids, Varela felt that the time was ripe to take his talents in a new direction—business ownership. Bidding fond farewell to his employer, Varela struck out on his own and never looked back.

Given the East Coast's inclement weather and abbreviated construction season, Varela knew California was the place he ought to be so, in 1989, he packed his bags and headed west. As soon as he obtained his construction license and set up his business an earthquake hit. The terrible natural catastrophe turned out to be a golden opportunity for Varela, and he jumped at the opportunity to help rebuild the structures and spirit of the San Francisco Bay Area.



Varela established ProVen Management in 1991, amidst

tough economic times, Varela admits, "The first four to five years were fairly tough with a lot of work and little profit. It was a challenge to settle into a new area, acquire equipment, and invest capital in the business in such uncertain times." However, true to form and as a testament to his work ethic and calculated risk taking, Varela overcame the odds and furthered his American success story. Over the last 20 years, ProVen Management has acquired more than 300 pieces of equipment and now employs 150 people. This client-focused company has earned a reputation in the Bay Area for outstanding, efficient work, and professionalism.

ProVen Management specializes in infrastructural work such as pump stations, waste-water treatment plants, environmental restoration, and transportation projects. It is also expanding into plant services. Two recent notable projects are the Victoria Canal Intake and Pump Station project in Holt, California, and the Tulloch Hydroelectric project in Jamestown, California. The Canal

## Take Note

**Alan Varela's tips for succeeding in the global marketplace**

▶ Understand the local economy. Research the trends and understand the way business is done in the international market.

▶ Hire local people to perform the work. Locals understand the marketplace and have established business relationships.

▶ Be well capitalized to weather any potential storms. Regardless of the strength of your business plan, expect cost and time overruns in the short term.

Case 3:21-cr-00592-WHO   Document 49   Filed 09/20/21   Page 21 of 22

Intake project was a $32 million, award-winning Alternative Intake Project (AIP) constructed to deliver water to 550,000 customers of the Contra Costa Water District. The Tulloch Hydroelectric project involved construction of a Phase III $10 million state-of-the-art multilevel concrete power house at an existing power-generation facility. Historically, ProVen Management's work has been primarily in the San Francisco Bay Area; however, recent projects have expanded ProVen's reach into Oregon, Southern California, and Washington. "We are expanding slowly but surely, although the bulk of our work is still within the San Francisco Bay Area," Varela says.



Although global work remains a small portion of ProVen's overall business, its expansion includes projects in the Midwest and Eastern United States. In 2011, ProVen Management opened its first office in Chile. Valera explains his reasons for tapping the Chilean market are twofold: first, his familiarity with his home country; and second, Chile's booming economy. He adds,

"The economy in Chile is fairing better than the US. We felt it would be beneficial to diversify our geographical reach so we are not so dependent on a single market."

Varela perceives that the most striking difference between the construction business in the US and in foreign countries is the way business is done. Varela explains, "In Chile business is done through relationships—it's who you know. Over here, it is a little more transparent. Most jobs are publically bid. Being awarded a job has more to do with pricing and submitting the proper documents rather than an accomplishment of relationships." Because Varela already had connections in Chile, the transition has been relatively smooth. He adds, "It is easy to create new connections through mutual friends and acquaintances."

As for ProVen Management's future, Valera's is focused on further expansion into Chile and throughout the western United States. He relentlessly searches for opportunities to diversify his company's contributions and to perform more challenging and interesting projects.